UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

LONNIE L. JACKSON,
a/k/a Anastacia,

        Plaintiff,

        v.                                      Case No. 12-CV-1035

GARY H. HAMBLIN, WILLIAM POLLARD,
CHARLES E. COLE, DR. PAUL SUNMISCHT[1],
BELINDA SCHRUBBE, and DR. DAVID BARNETT[2],

        Defendants.

---

DECISION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. 47) AND DENYING
PLAINTIFF'S MOTION FOR ORDER (DOC. 65)

The pro se plaintiff, Lonnie L. Jackson[3], is a Wisconsin state prisoner who claims that defendants denied her request for a hearing aid in violation of the Eighth Amendment to the United States Constitution. Defendants have filed a Motion for Summary Judgment. Additionally, Jackson has filed a Motion for Order Releasing Records and Allowing Inspection of In Camera Review of Defendants' Personnel Files. For the reasons set forth herein, the court will grant in part and deny in part defendants' summary judgment motion, deny Jackson's motion, and set a scheduling conference.

---

[1] According to his affidavit, the correct spelling of Dr. Sunmischt's name is "Sumnicht." The court will refer to him as Dr. Sumnicht.

[2] According to his affidavit, the correct spelling of Dr. Barnett's name is "Burnett." The court will refer to him as Dr. Burnett.

[3] Although housed in a male prison, Jackson self-identifies as a transgender male-to-female individual and has requested to be referred to with female pronouns. Defendants have honored this request and the court will do so as well.

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

FACTS[4]

A.  Parties

At all times relevant to this action, Jackson was a prisoner in the custody of the Wisconsin Department of Corrections (DOC). Similarly, defendant Gary Hamblin was the Secretary of the DOC; David Burnett, M.D., was the Medical Director of the DOC's Bureau of Health Services; William Pollard was the Warden of Waupun Correctional Institution (WCI); Charles Cole was the Deputy Secretary of the DOC; Paul Sumnicht, M.D., was employed by the State of Wisconsin as a physician; and Belinda Schrubbe, R.N., was employed by the State of Wisconsin as the manager of WCI's Health Services Unit.

Secretary Hamblin is not a licensed physician, does not provide direct patient care to DOC inmates, and does not make decisions about the health care that individual inmates receive. Warden Pollard is not a licensed physician, does not provide direct patient care to DOC inmates, and is not professionally qualified to determine whether an inmate such as Jackson needs a hearing aid. He does not make any decisions about the health care that individual inmates receive and had no involvement in determining what medical care Jackson received. Deputy Secretary Cole is not a licensed physician and does not provide direct patient care to DOC inmates. Dr. Burnett generally does not provide direct patient care to DOC inmates and he has not provided any direct patient care to Jackson. Nurse Schrubbe is not a licensed physician.

---

[4] Facts are taken from the Stipulation of Facts by the Parties in Support of Defendants' Motion for Summary Judgment (Doc. 44), Defendants' Proposed Findings of Fact (Doc. 49), and Plaintiff's Proposed Findings of Fact (Doc. 63).

B. Accessing Care

DOC policy governs how practitioners obtain approval to refer an inmate offsite for non-emergency care. If the physician determines that an inmate has a medical issue that requires an inmate to go off-site to see a specialist or undergo a procedure that cannot be performed at the institution, the physician will submit a Class III request to the Bureau of Health Services. If a treating physician determines that an inmate needs a hearing aid, he or she must obtain approval for the hearing aid using the Class III approval process. Medical necessity is determined by the physician or nurse practitioner using an examination, audiograms, and evaluation of the patient's needs in the institutional setting. As Medical Director, Dr. Burnett participates in responding to Class III requests. However, Dr. Burnett is not on-site at the DOC institutions to supervise daily operations of physician and nurse practitioner staff.

C. Inmate Complaint Review System

Cole's only involvement with Jackson's claim consisted of his role in the disposition of the inmate complaints WCI-2011-1140, WCI-2011-24868, and WCI-2012-8516 filed by Jackson regarding her complaint that she was not provided with a second hearing aid. Among Cole's duties as DOC Deputy Secretary, he was the DOC Secretary's designee for the purpose of making final agency decisions on offender complaints filed by inmates in the Inmate Complaint Review System.

D. DOC Practice

The current practice for hearing aids is for the practitioner to evaluate hearing with an audiogram and put in a Class III request for a hearing aid if indicated by testing. If hearing is abnormal in both ears, one hearing aid will be provided unless there is

4

information to justify hearing aids in both ears. For example, a functional problem or indication of profound loss establishes that one hearing aid is not sufficient. If an inmate has normal hearing in one ear the practitioner will need to document a functional problem with hearing announcements and/or show the inmate has a profound hearing loss. One hearing aid is usually sufficient to improve hearing for communication. When it is not, a second one may be provided. This has been the DOC practice for ten years or more.

  E. Medical Care of Jackson

On July 12, 2005, while at WCI, Jackson had a hearing test that showed normal hearing in the right ear and 40-50 dB (20 dB lower than normal) loss in the left ear. Jackson was transferred to the Oshkosh Correctional Institution (OSCI) on May 10, 2007. A June 7, 2007, audiogram showed normal right ear hearing and abnormal left ear hearing. The next day, Dr. Bohlmann submitted a Class III request and ENT evaluation for hearing loss and recommended a hearing aid for the left ear. The request was approved.

Jackson saw Dr. Wilkinson with the University of Wisconsin Hospital and Clinics on August 1, 2007, for an evaluation and a hearing test. Dr. Wilkinson recommended an MRI of the brain with contrast to evaluate for retrocochlear pathology.

On December 14, 2007, Jackson underwent an MRI exam, and later was told that the test for nerve damage was negative. Dr. Wilkinson recommended a left hearing aid. Based on that recommendation, Dr. Murphy put in a Class III request on December 17, 2007, for a left hearing aid due to left sided sensorinemal hearing loss.

James LaBelle, the nurse reviewer, forwarded Dr. Murphy's request to Dr. Burnett. On December 21, 2007, Dr. Burnett returned the request to Dr. Murphy and asked for more information regarding the hearing level in Jackson's right ear. On January 3, 2008, Dr.

5

Murphy noted that hearing in the right ear was normal. On the same date, Dr. Burnett inquired as to any functional problems that may support the need for a hearing aid. Jackson's left hearing aid was not approved on March 10, 2008, because the hearing in his right ear was normal.

Jackson returned to Waupun Correctional institution on January 13, 2009.

On March 3, 2009, Dr. Sumnicht saw Jackson for complaints of hearing and trouble keeping balance and other symptoms. Jackson complained of loud ringing, which was greater in the right ear than her left ear. Dr. Sumnicht ordered an audiogram that day. The audiogram was performed on March 6, 2009, and showed that Jackson had a 60-70 dB loss in both ears. HSU staff noted that the results were worse since the 2007 documentation. During the audiogram, Jackson claimed that her hearing was much worse than the year before and that she had received several warnings for missing count. She further complained of ringing in both ears and that the ringing was greater in the right ear than the left.

Dr. Sumnicht saw Jackson on May 22, 2009, for complaints of heartburn, hearing loss, and orthopedic foot inserts. Dr. Sumnicht noted that the audiogram showed 50 dB loss in the right ear over two years and submitted a Class III request for a right hearing aid due to a hearing loss that had developed in that ear since 2007 when Jackson's hearing was normal in that ear. The hearing loss in the left ear remained the same.

Dr. Burnett approved the right hearing aid on May 26, 2009, and Jackson was sent to Avada Hearing Center for right hearing aid evaluation on July 1, 2009. Avada staff noted that the air conduction and bone conduction pure tone test yielded unreliable results. At

that time, an impression was taken for the right ear instrument. The right hearing aid was delivered to Jackson on September 30, 2009.

An October 22, 2009, audiogram showed 30-40 dB loss with a hearing aid in the right ear. Dr. Sumnicht met with Jackson on November 9, 2009, to review the audiogram results. He noted that Jackson stated that the hearing aid was working out well and that she had good functioning in the right ear. Dr. Sumnicht found that the "TM" was clear in the right and left ears and that Jackson understood speech well.

On December 6, 2010, Dr. Sumnicht met with Jackson again for an exam and to review her EKG. He noted that Jackson complained of loud constant ringing in her left ear and ordered another audiogram. This audiogram was performed on December 17, 2010, and showed the hearing in her left ear had decreased to 40 dB. On January 4, 2011, Jackson had a 40-50 dB loss in both ears without a hearing aid.

Dr. Sumnicht also met with Jackson on January 10, 2011, for an exam and noted concerns of left ear tinnitus and hearing loss. He performed a "Rhomberg test" and found no lateral nystagmus and the TM was clear. Jackson avers that during this visit Dr. Sumnicht said that unless she is missing meals and bumping into walls, her hearing is fine. According to Jackson, she made a Class III Request to be seen by a hearing specialist but Dr. Sumnicht refused and said that Dr. Burnett would not approve it based on the current budget and his job was to save costs for the prison system. Dr. Sumnicht disputes that he did not submit a Class III request because Dr. Burnett would not approve it.

On January 14, 2011, Dr. Sumnicht noted unexpected fluxuations of the audiograms and ordered a repeat audiogram in 30 days. An audiogram was performed on February 10,

2011, which showed that Jackson tested at a 60-70 dB loss in both ears without a hearing aid.

Between January 25, 2011, and May 2011, Jackson saw Dr. Sumnicht on many occasions and each time she complained of loud ringing noises, dizziness, and the need to have a second hearing aid. Dr. Sumnicht told Jackson that he would send her out to have another MRI but not until July when the new budget came out because there would be more money in the budget. In July 2011, Dr. Sumnicht told Jackson that he changed his mind about the MRI because it would be a waste of time and money. Instead, he advised, "Pray to God for better hearing in the future, that sometimes we have to live with some form of pain, it's a fact of life." (Jackson Aff. ¶ 26.)

Dr. Sumnicht met with Jackson on September 7, 2011, for review of her hearing issues. Dr. Sumnicht noted that Jackson could function well with a right hearing aid. Jackson claimed left ear loud ringing, buzzing and headaches. She further claimed the throbbing was greater in the left ear than the right. After the exam, Dr. Sumnicht found progressive hearing loss with both ears and that the hearing tests went up and down. Based on the exam, Dr. Sumnicht assessed possible Meniere's disease and made a plan to start treatment with hydrochlorothiazide. The medicine was a therapeutic trial to see if the hearing would improve.

Dr. Sumnicht met with Jackson on November 29, 2011, for complaints that ringing in her ears drowned out the hearing to the left ear. Dr. Sumnicht noted the 2007 ENT and December 14, 2007, MRI. On exam, Dr. Sumnicht found no balance problems and that Jackson's headaches were adding to vertigo episodes associated with the headaches. Dr. Sumnicht noted that the right hearing aid allowed for normal hearing function. Moreover,

Dr. Sumnicht assessed migraine with vertigo and tinnitus (left hearing loss) and prescribed Topirmate 50 milligrams at bedtime to treat migraines.

On November 30, 2011, Jackson wrote to Dr. Burnett asking him to step in and deal with several matters, i.e., (1) denial of the second hearing aid for her left ear by Dr. Sumnicht and Nurse Schrubbe, (2) verification of a policy or practice of only allowing prisoners one hearing aid, (3) confirmation whether the DOC's budget will not pay for the second hearing aid because of prohibition policy of one hearing aid, (4) the notion that prisoners have to get "Conduct Reports" to prove functioning problems in order to qualify for the second hearing aid, and (5) what qualifies as a "Medically Necessary to Function Standard." Jackson also made Dr. Burnett aware of her medical issues.

Dr. Sumnicht met with Jackson on December 22, 2011, to follow-up on her headaches. At that time, Jackson claimed the migraines were better on the Topirmate. On exam, Dr. Sumnicht determined the "CN intact," no nystagmus, regular heart rate, and clear lungs. Dr. Sumnicht further found that Jackson was articulate and the Rhomberg test was normal. Based on the exam, Dr. Sumnicht assessed hearing loss tinnitus and manageable migraines and made a plan to discontinue the hydrochlorothiazide, which was found to be ineffective, and to continue the Topirmate.

On March 28, 2012, Dr. Sumnicht met with Jackson for her complaints of feeling off balance and hearing loss. Dr. Sumnicht examined Jackson and found that no change in the current treatment was needed and educated her about weight shifting and gravity pedal edema. Dr. Sumnicht made a plan to get a "PSA" for completeness.

Jackson submitted correspondence dated April 9, 2012, asking for a second hearing aid. Jackson claimed that she had been examined by Dr. Karau of Avada Audiology and

9

Hearing Care, who documented that Jackson needed two hearing aids, but she was denied the left ear hearing aid. Jackson also asked for the one-hearing-aid-per-inmate policy as well as the DOC guidelines relating to the treatment and care of inmates with hearing loss, and what classifies as "Medically Necessary" and "Normal Functioning" in approving and denying hearing aids to the hearing impaired. Nurse Schrubbe responded, "It's not a policy but only a Practice as explained in the Courtyard." (Jackson Aff. ¶ 36.) Jackson also informed Schrubbe of Dr. Sumnicht's refusal to submit a Class III request for the second hearing aid. Schrubbe told Jackson to send her a "HSU slip" and that she would look into it. Jackson received a response from Schrubbe on April 18, 2012, denying her complaint and informing Jackson that she did not meet the criteria for a second hearing aid for the left ear because she was functioning well with one hearing aid.

On April 12, 2012, at 12:30 p.m., Jackson was called to the HSU to see Dr. Sumnicht concerning her diabetic check up. During that visit Jackson informed Sumnicht that she could barely hear in her left ear and that she was dissatisfied about the lack of treatment she was receiving, because he was allowing her hearing to get worse, money should not be the reason for not providing treatment, and cost and saving money should not be used to evaluate treatment. According to Jackson, Dr. Sumnicht replied, "my hands are tied," and that it was up to Dr. Burnett. Jackson also questioned Dr. Sumnicht about why he failed to submit a Class III request to have her fitted with the recommended left ear hearing aid and he replied, "because of the policy, we're not allowed to provide a second hearing aid, we are only allowed to give one hearing aid per inmate." (Jackson Aff. ¶ 37.) Defendants dispute Jackson's assertion as to Dr. Sumnicht's statements.

According to Jackson, she questioned Sumnicht about who wrote that policy, and he replied that Dr. Burnett had instructed him to save institutional cost, and that HSU was only allowed to issue one hearing aid per inmate. Dr. Sumnicht also said that he was under orders to follow the guidelines of the Medicare program, and that Jackson had to live with going deaf, it was a part of life, and that he would not make any recommendations to get a second hearing aid regardless for the need of it. Defendants dispute that Dr. Sumnicht stated that he told Jackson that he would have to live with going deaf, it was a part of life, and would not make any recommendations to get a second hearing aid regardless of the need for it. Jackson further avers that she asked Dr. Sumnicht about the pain she was still having along with the constant buzzing, loud ringing, and dizziness, and he replied, "you have to deal with it the best you can, but Madison (Burnett) will not approve the second hearing aid." (Jackson Aff. ¶ 39.) He also avers that Schrubbe confirmed what Dr. Sumnicht told her as it relates to her request for a second hearing aid for her left ear. Defendants dispute these statements.

Schrubbe does not and did not have the authority to approve and/or deny the second hearing aid. This is a medical determination made by the treating physician. Schrubbe did not have the authority to override the treatment decisions of the physicians. To Schrubbe's knowledge and based on review of the records, the treatment provider, Dr. Sumnicht, determined that a second hearing aid was not necessary at that time.

Jackson was transferred to RCI on November 5, 2012. Dr. Sumnicht had no further involvement with the allegations of the complaint.

11

F. Defendants' Assessment of Medical Care Jackson Received

To Dr. Burnett's knowledge and based on his review of the record, there has been no Class III request submitted by any treating DOC physician for a second hearing aid. In Jackson's case, the audiogram results jumped around unpredictably. For example, on March 2009, she had a 60-70 dB loss in both ears that got slightly better in the left ear and somewhat better with 30-40 dB loss with a hearing aid in the right ear by October 2009. On January 4, 2011, Jackson had a 40-50 dB loss in both ears without a hearing aid and one month later she tested at a 60-70 dB loss in both ears without a hearing aid. Her hearing tests at WCI suggest her hearing comes and goes and is not a persistent dense hearing loss. A second hearing aid was not going to be requested until a trial of one hearing aid failed.

To Dr. Sumnicht's knowledge and based on his review of the records, Jackson's hearing loss cause remains unknown. Because her headaches improved without a change in her hearing loss, it is Dr. Sumnicht's opinion to a reasonable degree of medical certainty that the headaches and hearing loss are two separate problems and the headaches did not cause the hearing loss. Repeated blood tests to evaluate the hearing loss and scheduled blood test for chronic diabetes management did not show a cause of hearing loss from infection, vitamin deficiency, hormone imbalance, or auto immune diseases. No medications were suspected to cause the inmate's hearing loss. High blood sugar diabetes is the only cause found for chronic nerve damage. The history of loud noise exposure does not fit the timing of Jackson's hearing loss because it occurred before Jackson's incarceration in 2003 and was first documented in July of 2007 at WCI. It is Dr. Sumnicht's opinion that a second hearing aid was not medically necessary while Jackson was at WCI.

DISCUSSION

A.  Personal Involvement

Defendants contend that the claims against Hamblin, Pollard, Cole, and Schrubbe should be dismissed for lack of personal involvement in Jackson's claim. Only a defendant who is personally responsible for depriving the plaintiff of a constitutional right may be held liable under § 1983. *Grieveson v. Anderson*, 538 F.3d 763, 778 (7th Cir. 2008). If someone else has committed the act that resulted in the constitutional deprivation, then the defendant is personally responsible, and thus liable under § 1983, only if he knows about the other person's act, has a realistic opportunity to prevent it, but deliberately or recklessly fails to do so. *Lewis v. Downey*, 581 F.3d 467, 472 (7th Cir. 2009).

Here, the record reveals that Hamblin and Pollard had no personal involvement in Jackson's claim. Cole's involvement was limited to his role in the disposition of three inmate complaints Jackson filed regarding her complaint that she was not provided with a second hearing aid. As DOC Deputy Secretary, Cole was the DOC Secretary's designee for the purpose of making final agency decisions on offender complaints filed by inmates in the Inmate Complaint Review System. However, those who review administrative decisions of others are not liable. *Burks v. Raemisch*, 555 F.3d 592, 595-96 (7th Cir. 2009); *George v. Smith*, 507 F.3d 605, 609-10 (7th Cir. 2007) ("Ruling against a prisoner on an administrative complaint does not cause or contribute to the [constitutional] violation."). Especially in the area of medical care, prison officials who are not physicians are entitled to defer to the medical judgment of staff physicians. *See Perkins v. Lawson*, 312 F.3d 872, 875-76 (7th Cir. 2002). An administrator does not become responsible for a doctor's exercise of medical judgment simply by virtue of reviewing an inmate grievance. *See Greeno v. Daley*,

414 F.3d 645, 655-56 (7th Cir. 2005). Accordingly, Hamblin, Pollard, and Cole are entitled to dismissal of the claims against them.

B. Eighth Amendment Claim

Defendants further contend that Jackson's Eighth Amendment claim fails because she did not have a serious medical need and even if she did, they did not act with deliberate indifference. "The Eighth Amendment safeguards the prisoner against a lack of medical care that 'may result in pain and suffering which no one suggests would serve any penological purpose.'" *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011) (quoting *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009); *see also Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). Prison officials violate the Constitution if they are deliberately indifferent to prisoners' serious medical needs. *Arnett*, 658 F.3d at 750 (citing *Estelle*, 429 U.S. at 104). Hence, a claim based on deficient medical care must demonstrate two elements: 1) an objectively serious medical condition; and 2) an official's deliberate indifference to that condition. *Arnett*, 658 F.3d at 750 (citation omitted). "Deliberate indifference to serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution." *Rodriguez*, 577 F.3d at 828 (quoting *Estelle*, 429 U.S. at 103).

A medical need is considered sufficiently serious if the inmate's condition 'has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would perceive the need for a doctor's attention." *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) (quoting *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)). "A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated."

*Roe*, 631 F.3d at 857 (quoting *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010)). A broad range of medical conditions may be sufficient to meet the objective prong of a deliberate indifference claim, including a dislocated finger, a hernia, arthritis, heartburn and vomiting, a broken wrist, and minor burns sustained from lying in vomit. *Roe*, 631 F.3d at 861 (citing *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007) (collecting cases)). On the other hand, a prison medical staff "that refuses to dispense bromides for the sniffles or minor aches and pains or a tiny scratch or a mild headache or minor fatigue – the sorts of ailments for which many people who are not in prison do not seek medical attention – does not by its refusal violation the Constitution." *Gutierrez v. Peters*, 111 F.3d 1364, 1372 (1997) (quoting *Cooper v. Casey*, 97 F.3d 914, 916 (7th Cir. 1996)).

Here, the record reflects that Jackson saw medical professionals for a number of years related to her left ear condition. Audiograms confirmed that she had a significant hearing loss in her left ear and multiple medical providers recommended a hearing aid for the left ear since 2007. Additionally, eventually Jackson experienced loud ringing, constant buzzing, and pain in her left ear. She also experienced dizziness, loss of balance, and migraines, although the migraines were effectively treated with Topirmate.

Jackson's situation is distinguishable from that of the inmate in *Irby v. Sumnicht*, 683 F. Supp. 2d 913 (W.D. Wis. 2010). In that case, Judge Crabb held that the prisoner failed to demonstrate a serious medical need for a second hearing aid where a four-year-old audiogram showed that the prisoner had 5-10 decibels of deterioration in both ears but already had a fully functioning hearing aid for one ear. *Id.* at 914-16. The inmate in *Irby* failed to adduce evidence that the absence of a hearing aid in both ears caused him significant pain, substantially interfered with his daily activities, or otherwise subjected him

15

to a substantial risk of serous harm. *Id.* at 915 (citations omitted). By contrast, in this case, an inference may be made that Jackson had a serious medical need for a second hearing aid because multiple medical providers recommended a hearing aid for the left ear before she suffered any hearing loss in her right ear. Moreover, Jackson's multiple medical appointments related to her left ear and Jackson's averment that Dr. Sumnicht told her she would have to deal with the constant buzzing, loud ringing, and dizziness as best she could because "Madison (Burnett)" would not approve a second hearing aid supports an inference that at least some of Jackson's symptoms were related to the lack of a hearing aid. Consequently, the court concludes that Jackson has a serious medical need.

Next, defendants contends that even if Jackson had a serious medical need, they were not deliberately indifferent to it. To demonstrate deliberate indifference, a plaintiff must show that the defendant "acted with a sufficiently culpable state of mind," something akin to recklessness. A prison official acts with a sufficiently culpable state of mind when he or she knows of a substantial risk of harm to an inmate and either acts or fails to act in disregard of that risk. *Roe*, 631 F.3d at 857. Deliberate indifference "is more than negligence and approaches intentional wrongdoing." *Arnett*, 658 F.3d at 759 (quoting *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 988 (7th Cir. 1998)). It is not medical malpractice; "the Eighth Amendment does not codify common law torts." *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008).

A jury can infer deliberate indifference on the basis of a physician's treatment decision when the decision is "so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Arnett*, 658 F.3d at 759 (quoting *Duckworth*, 532 F.3d at 679). A plaintiff can show that the professional

16

disregarded the need only if the professional's subjective response was so inadequate that it demonstrated an absence of professional judgment, that is, that "no minimally competent professional would have so responded under those circumstances." *Roe*, 631 F.3d at 857 (quotation marks omitted). However, a prisoner "need not prove that the prison officials intended, hoped for, or desired the harm that transpired." *Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002). "Nor does a prisoner need to show that he was literally ignored." *Arnett*, 658 F.3d at 751 (citing *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)). That the prisoner received some treatment does not foreclose his deliberate indifference claim if the treatment received was "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate his condition." *Arnett*, 658 F.3d at 759 (quoting *Greeno*, 414 F.3d at 653). However, deliberate indifference is a high standard; it requires proof that the state officials actually knew of the inmate's serious medical need and that they disregarded it. *Walker*, 293 F.3d at 1037.

Here, there are several factual disputes as to whether Dr. Sumnicht, Dr. Burnett, and Nurse Schrubbe were deliberately indifferent to Jackson's medical needs. This issue centers on whether they relied on the DOC's "practice" in denying her a second hearing aid and whether the lack of a second hearing aid caused Jackson's symptoms. Specifically, Jackson avers that on January 10, 2011, Dr. Sumnicht refused to submit a Class III request for her to be seen by a hearing specialist because Dr. Burnett would not approve it based on the current budget. In July 2011, after initially telling Jackson that he would send her out for another MRI, Dr. Sumnicht told her that he changed his mind because it would be a waste of time and money. He suggested that she, "Pray to God for better hearing in the future, that sometimes we have to live with some form of pain, it's a fact of life." (Jackson

17

Aff. ¶ 26.) On April 12, 2012, Jackson avers that Dr. Sumnicht told her that "my hands are tied," and that it was not up to him but rather it was up to Dr. Burnett. Jackson also swears that she questioned Sumnicht about why he failed to submit a Class III request to have her fitted with the recommended left ear hearing aid and he replied, "because of the policy, we're not allowed to provide a second hearing aid, we are only allowed to give one hearing aid per inmate." (Jackson Aff. ¶ 37.) According to Jackson, she then questioned Sumnicht about who wrote that policy, and he replied that Dr. Burnett has instructed him to save institutional cost, and that HSU was only allowed to issue one hearing aid per inmate. Jackson adds that Dr. Sumnicht also said that he was under orders to follow the guidelines of the Medicare program, and that Jackson had to live with going deaf, it was a part of life, and that he would not make any recommendations to get a second hearing aid regardless for the need of it.

In addition, Jackson submitted a correspondence dated April 9, 2012, asking for a second hearing aid. Schrubbe informed him of the DOC's practice and then informed him that she did not think that Jackson met the criteria for a second hearing aid because she was functioning well with one hearing aid. Lastly, Jackson has submitted evidence that Dr. Burnett was aware of her medical issues. Moreover, the practice in question was allegedly enacted at his direction and, while there was an exception for medical necessity, Jackson has raised a factual issue that the practice was not carried out that way in her case. *See Gilmore v. Hodges*, 738 F.3d 266, 275-76 (11th Cir. 2013). This factual dispute as to whether Dr. Sumnicht, Nurse Schrubbe, and Dr. Burnett acted with deliberate indifference to Jackson's medical need cannot be resolved at summary judgment.

PLAINTIFF'S MOTION FOR ORDER RELEASING RECORDS AND ALLOWING IN CAMERA REVIEW OF DEFENDANTS' PERSONNEL FILES

By this motion brought pursuant to Federal Rule of Civil Procedure 34, Jackson seeks to inspect and review defendants' employment records or, alternatively, requests that the court conduct an in camera inspection of the entire employment record of defendants to determine what relevant portions to release to Jackson. Defendants oppose the motion.

Jackson's request seeks discovery of documents beyond what is relevant to her claim. *See* Fed. R. Civ. P 26(a). Moreover, to the extent that the request may be construed as a motion to compel discovery, she did not certify that she first consulted with defendants. *See* Fed. R. Civ. P 37(a). Therefore,

IT IS ORDERED that defendants' Motion for Summary Judgment (Doc. 47) is GRANTED IN PART AND DENIED IN PART as set forth herein.

IT IS FURTHER ORDERED that the claims against Hamblin, Pollard, and Cole are DISMISSED.

IT IS FURTHER ORDERED that plaintiff's Motion for Order (Doc. 65) is DENIED.

IT IS FURTHER ORDERED that the court will conduct a telephonic scheduling conference on August 5, 2014, at 1:30 PM. The court will initiate the call.

Dated at Milwaukee, Wisconsin, this 8th day of July, 2014.

BY THE COURT

/s/ C.N. Clevert, Jr.
C.N. CLEVERT, JR.
U.S. DISTRICT JUDGE